IN RE CAMPBELL

(No. 83-04-036—Decided
October 24, 1983.)

*Mr. Daniel G. Eichel,* for appellee
Butler County Welfare Department.

*Mr. Fred Miller,* for appellee depen-
dent child.

*Mr. Jeffrey K. Milbauer,* for appellant
father.

*Per Curiam.* This cause came on to be
heard upon an appeal from the Court of
Common Pleas of Butler County.

James Ernest Campbell, Jr. ("James,
Jr.") was born on January 18, 1983 to
Lydia and James E. Campbell. Nine days
later, appellee Butler County Welfare
Department ("welfare department") filed
a complaint which alleged that James, Jr.
was a dependent child and requested
permanent custody.

A single hearing was held on March
10, 1983 at which all parties were
represented by counsel; and, the trial
court, at the close of the appellant's
evidence, held that James, Jr. was a
dependent child, granted the welfare
department's motion for permanent
custody and divested the child's parents
of their parental rights. The court's order

was journalized on March 19, 1983, and
the appeal herein was subsequently in-
itiated.

James E. Campbell, the father of the
allegedly dependent child and the sole ap-
pellant herein, attacks the judgment
below as being against the manifest
weight of the evidence. He argues that
where there is disputed testimony as to
the conditions into which a newborn baby
would be placed and where there are no
psychological evaluations or other
evidence on the issue of whether the ap-
pellant might properly care for his son,
then the state has failed to meet its
burden by clear and convincing evidence.

In a dependency action, the burden is
on the state to justify a monumental intru-
sion into the privacy of family life — that
of removing, in this case permanently, a
child from the custody and control of his
parents. In deciding that a "pre-
ponderance of the evidence" standard
was intolerable under the Due Process
Clause of the Fourteenth Amendment to
the United States Constitution, the
United States Supreme Court held that a
state must support its allegations by
"clear and convincing evidence" and
stated that:

"The fundamental liberty interest of
natural parents in the care, custody, and
management of their child does not
evaporate simply because they have not
been model parents or have lost tem-
porary custody of their child to the State.
Even when blood relationships are
strained, parents retain a vital interest in
preventing the irretrievable destruction
of their family life. * * *" *Santosky* v.
*Kramer* (1982), 455 U.S. 745, 753.

In the case at bar, the state requested
and was awarded permanent custody of a
very young child. Where previously
childless parents face the possibility of
losing custody of a child before they have
brought the child home from the hospital,
the burden on the state is even more
severe. In this case, a careful review of
the testimony is necessary to resolve the
issue raised by the appellant.

Mrs. Campbell, prior to giving birth, was incarcerated for shoplifting a cigarette lighter and had previously been incarcerated for arson. She has attempted to commit suicide on at least two occasions and has been diagnosed as being mentally retarded. She has had a stormy relationship with her husband and has spent much time apart from him and with her mother, Pansy Walters. Mrs. Walters testified that Mrs. Campbell stated, approximately five weeks before the baby's birth, that she did not want the baby and would "throw it in the river" or leave it on someone's doorstep. Mrs. Walters also testified that Mrs. Campbell was mentally incapable of performing simple tasks related to taking care of herself, such as tying her shoes.

Kiene Landry, a social worker with the Butler County Welfare Department, testified that she responded to a call from Mrs. Walters and investigated the Campbell household. She met with the Campbells on four occasions, asked them a number of questions on the raising of children, and generally observed the conditions in which they were living. At a visit to their current residence, she noted that they lived in a two-room apartment with no kitchen facilities. The Campbells were unable to produce clean clothing for the baby and exhibited dirty, mildewed baby bottles. Mr. Campbell stated that he would feed the child breakfast cereal and that premature babies, such as James, Jr., were "easier to take care of than regular babies." The Campbells were never able to produce a bassinet or any of the other usual paraphernalia one would associate with the expected arrival of a newborn baby into a household. Neither Mr. nor Mrs. Campbell was employed, and they apparently lived on the $284.30 Mrs. Campbell received each month from the federal government.

Mr. Campbell testified that he had, in fact, procured both a bassinet and a baby buggy, but that he simply did not show them to the social worker. He also testified that he had other baby clothing and blankets but was unable to find them when Ms. Landry arrived and that, although he had scalded the baby bottles while heating them, he had a number of clean nipples for the bottles.

Though not assigned as error, we would note that the Juvenile Rules clearly provide for *bifurcated* proceedings. Juv. R. 29(F); Juv. R. 34. However, the adjudicatory hearing may or may not be followed by a dispositional hearing, at the discretion of the court. Having two distinct proceedings helps to insure that the issue of the "best interests of the child" is not discussed before the court makes its adjudication.

In the case at bar, the adjudication clearly turned on disputed testimony and the judge's personal observation of the witnesses. The court apparently chose to believe, and attach much weight to, the testimony of Ms. Landry and Mrs. Walters in finding that James, Jr. was a dependent child. While this court will not question those findings, the preliminary issue of whether a child can be dependent *before* he is released to his parents from the hospital is also raised.

Three Ohio cases have discussed this issue and have answered the question in the affirmative. *In re East* (1972), 32 Ohio Misc. 65 [61 O.O.2d 38]; *In re Turner* (1967), 12 Ohio Misc. 171 [41 O.O.2d 264]; and *In re Baby Girl S.* (1972), 32 Ohio Misc. 217 [61 O.O.2d 439]. All three are juvenile court decisions which were, apparently, never appealed; and the latter two decisions were written by the same judge, the Honorable John R. Milligan. This court has not found any court of appeals' opinions or Supreme Court opinions discussing this issue.

R.C. 2151.04 defines a "dependent child" as any child:

"(A) Who is homeless or destitute or without proper care or support, through no fault of his parents, guardian, or custodian;

"(B) Who lacks proper care or support by reason of the mental or physical

condition of his parents, guardian, or custodian;

"(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming his guardianship."

Ohio courts have held that the focus of a charge that a child is dependent is on the child and his condition, not the faults of the parents, and a finding of dependency must be grounded on whether the child is receiving proper care. See, e.g., In re Bibb (1980), 70 Ohio App. 2d 117 [24 O.O.3d 159]; In re Justice (1978), 59 Ohio App. 2d 78 [13 O.O.3d 139].

In contrast, a finding of "neglect" must be based on the commission of culpable acts by the parent or parents. R.C. 2151.03 defines a "neglected child" solely in terms of parental disregard for those duties consistent with the healthy upbringing of a child. Clearly, where the parents must commit some culpable act in their upbringing of the child, a finding of neglect, made before the parents have ever had custody of the child in their own home, would be improper.

However, where the state can show that the "condition" or "environment" into which a newborn baby will enter is such as to justify the state's preventing that child from entering that environment, it is clear that the state may intervene. R.C. 2151.04(C). By focusing on the environment, which can be viewed and evaluated with or without the child, the legislature has chosen to permit the state to intercede in familial affairs at this early stage.[1] A juvenile court should not be forced to experiment with the health and safety of a newborn baby where the state can show, by clear and convincing evidence, that placing the child in such an environment would be threatening to the health and safety of that child.

There is a danger lurking beneath this rationale, however, over which this court has agonized. There is a danger that such dependency proceedings will be used overzealously by those who, with the best of intentions, are too quick to justify the taking of a child from its natural parents. In holding that a complaint alleging that a nine-day old child is dependent is not inherently improper, we must necessarily balance the "fundamental liberty interest" of natural parents in the care and custody of their children with the state's *parens patriae* authority to protect the health and safety of young children. To justify permanently removing children from their parents at such an early age, the risk of imminent harm must be great and the potential for a successful reunification slight.

The evidence in the case at bar is such as to justify the permanent removal of James, Jr. from the custody of his father and mother. As we stated above, to put this child into the environment described by Ms. Landry and Mrs. Walters would be to experiment with the child's safety with the hope that Mr. or Mrs. Campbell could learn to properly feed, care for and provide for the child before the child's health or well-being was adversely affected. We do not feel that the trial court's decision was against the manifest weight of the evidence.

Accordingly, appellant's sole assignment of error is hereby overruled.

The assignment of error properly before this court having been ruled upon as heretofore set forth, it is the order of this court that the judgment order herein appealed from be, and the same hereby is, affirmed.

*Judgment affirmed.*

HENDRICKSON, P.J., and KOEHLER, J., concur.

JONES, J., concurs separately.

JONES, J., concurring.

---

[1] We would note that the constitutionality of this statute was not raised as an issue in this case.

I concur with the persuasive rationale of the majority opinion and share the majority's concern that we may be establishing a dangerous precedent in giving our imprimatur to the taking of a newborn infant from its parents before the infant is even released from the hospital. In reaching this hard decision, I have tried not to be influenced by the fact that the parents are public charges, and that the taxpayers assuredly are paying the medical expenses attendant to the birth, as well as the legal fees for appellant's attorney and the child's attorney, both at the trial and appellate level. The same can be said, of course, with respect to the salaries of the prosecutors, the social workers, and the members of this court. I mention this only because some might interpret our decision to be based upon a lack of financial responsibility on the part of the parents. The fundament of our decision, however, is based upon a perception that the trial court did not abuse its discretion in determining that the granting of custody to the parents would be a long-odds gamble with respect to the life of the child.